STATE of Missouri ex rel. BARBER & SONS TOBACCO COMPANY, INC., Appellant,

v.

JACKSON COUNTY, Missouri and Lake Lotawana Association, Inc., Respondents.

No. WD 46569.

Missouri Court of Appeals, Western District.

Nov. 16, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 28, 1993.

Application to Transfer Denied Feb. 22, 1994.

Michael T. White, Polsinelli, White, Vardeman & Shalton, Kansas City, for appellant.

Lucie V. Wolcott, County Counselor Office, Kansas City, for respondent Jackson County, MO.

Patrick B. Starke, Welch & Starke, Blue Springs, for respondent Lake Lotawana Ass'n, Inc.

Before BERREY, P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Barber & Sons Tobacco Company (Barber) appeals the judgment of the trial court against Barber and in favor of Jackson County, Missouri (Jackson County) and intervenor Lake Lotawana Association, Inc., (Lotawana, Inc.) on Barber's action for declaratory judgment and damages. Barber contends on appeal that the trial court erred (1) in refusing to hold unreasonable the existing zoning classification of a twelve-acre parcel of land owned by Barber and (2) in failing to grant the remedy of ordering Jackson County to approve the proposed rezoning of the parcel. The judgment of the trial court is affirmed.

Barber is a corporation organized under the laws of the State of Missouri with its principal place of business located in Kansas City, Jackson County, Missouri. Jackson County is a first class constitutionally-chartered county organized under the constitution and laws of the State of Missouri and its Charter. Lotawana, Inc. is a not-for-profit Missouri corporation that represents the interests of persons who own real property within the City of Lake Lotawana.

Barber owns approximately 3,800 acres of land in the unincorporated area of Jackson County, approximately 2,400 acres of which are located at the northwest corner of Missouri Highway 7 and U.S. Highway 50. Approximately twelve acres of land located within the larger 2,400 acre tract comprise the subject matter of this litigation (the twelve-acre parcel).

On December 29, 1972, the Jackson County Board of Zoning Adjustment granted a special use permit, Permit No. S–266, for the crushing and stockpiling of rock and the underground mining of limestone on a 493–acre area bordered generally by Missouri Highway 7, Langsford Road, and Milton Thompson Road. The twelve-acre parcel was not part of the property included in the provisions of Permit S–266; however, on or about the same date Permit S–266 was granted, Jackson County zoned approximately 1,375 acres of land, including the twelve-acre parcel, to District A, First Dwelling House District, single family residential. District A remains the current zoning designation for the twelve-acre parcel and all but eight acres of the 1,375 acres originally so zoned.

On July 8, 1981, the Jackson County Board of Zoning Adjustment approved a fifty-year special use permit, Permit No. S–499, for the crushing and stockpiling of rock and the underground mining of limestone on Barber property located generally south of Langsford Road, north of U.S. Highway 50, and west of Missouri Highway 7. The property covered by Permit S–499 included the twelve-acre parcel. As a condition for the approval of Permit S–499, Barber gave up the right granted under Permit S–266 to carry on surface rock crushing and stockpiling north of Langsford Road. The Jackson County Board of Zoning Adjustment amended Permit S–499 on January 8, 1986, to allow twenty years of surface preparation before requiring Barber to begin underground mining.

Under Permits S–266 and S–499, Barber has operated a rock mining enterprise with plans that involve the use of much of the 2,400 acres owned by Barber and located at the northwest corner of Missouri Highway 7 and U.S. Highway 50. Barber anticipates that approximately 450 of the 2,400 acres will be surface-mined to prepare a surrounding protective berm and a bowl area from which other portions of the 2,400 acres will be undermined. The twelve-acre parcel is located in approximately the center of the 2,400 acres and is within the 450 acres that will eventually be surface-mined. Barber estimates that future surface mining will lower the elevation of the twelve-acre parcel by 100 feet.

At the time of trial, over eighty acres of the area to be mined under the special use permits had been quarried. A bowl area had been fashioned and a berm over one mile long and 1200 feet wide had been constructed along the west side of Highway 7. The

twelve-acre parcel was being used to store crushed rock and by-products.

At the northeast corner of the twelve-acre parcel is an eight-acre area of land zoned District H, Heavy Industrial District, which was being used at the time of trial as the site of an asphalt plant operated by Bowen Asphalt Company under a lease agreement with Barber. With the exception of the tract of land occupied by the asphalt plant, all of the land subject to the special use permits was zoned for either agricultural or residential use.

Since the Barber quarry operation began in 1983, the primary land development outside the perimeter of the quarry has been residential. Several new residential developments have been initiated, and existing residential developments, including the City of Lake Lotawana, have been expanded. Other than housing developments, the area outside the quarry is generally agricultural.

The Barber quarry operation mines and sells about one million tons of rock each year. Barber sells large quantities of rock aggregate to Jackson County Readymix, which uses the aggregate to make readymix concrete at its plant in Blue Springs, Missouri.

Jackson County Readymix determined that a readymix plant located on Barber's quarry, allowing the concrete to be mixed closer to the source of the rock aggregate, would be more efficient and would reduce delivery costs. On March 15, 1989, Jackson County Readymix agreed to lease the twelve-acre parcel from Barber for the purpose of constructing and operating a readymix plant on Barber's premises. The lease agreement was made contingent upon the rezoning of the twelve-acre parcel to allow the proposed use.

On March 22, 1989, Jackson County Readymix filed an application with the Jackson County Planning and Development Department seeking rezoning of the twelve-acre parcel from District A (single family residential) to District G (light industrial) for the purpose of constructing and operating the concrete batch mixing plant at the Barber quarry. The staff of the Planning and Development Department recommended approval of the application. After two public hearings on the application, the Jackson County Planning Commission voted to recommend denial of the rezoning request.

On August 7, 1989, Ordinance No. 1754 authorizing the previously requested zoning change for the twelve-acre parcel was introduced in the Jackson County Legislature. The legislature's Land Use Committee convened a hearing on the application on September 11, 1989. Following the Land Use Committee's hearing, the committee's chairperson reported to the Jackson County Legislature that the committee recommended against approval of the application. The legislature then voted against approval of the application.

Barber subsequently sought relief from the Circuit Court of Jackson County. In its second amended petition, filed January 10, 1991, Barber sought in part a judgment (1) declaring that the existing zoning of the twelve-acre parcel as single family residential was unreasonable and a denial of substantive due process in violation of the Missouri and United States Constitutions; (2) ordering Jackson County to approve the proposed rezoning; and (3) awarding Barber damages and attorney fees.

After conducting a five-day trial, the circuit court entered an order on June 23, 1992, denying the relief requested by Barber in its second amended petition. Barber now appeals the judgment of the circuit court.

### I.

■ Barber contends as its first point on appeal that the trial court erred in refusing to hold unreasonable the existing zoning of the twelve-acre parcel. Barber argues that the current zoning of the twelve-acre parcel as residential is unreasonable in light of the fact that the twelve-acre parcel lies in the middle of a rock quarry, is adjacent to an asphalt plant and a rock crusher, and is currently used to store crushed rock and by-products.

■ To comply with the due process clauses of both the Fourteenth Amendment to the United States Constitution and Article 1, Section 10 of the Missouri Constitution, zon-

ing provisions must "bear a substantial relationship to health, safety, morals or the public welfare." *Elam v. City of St. Ann*, 784 S.W.2d 330, 334 (Mo.App.1990), (citing *Flora Realty & Investment Co. v. City of Ladue*, 362 Mo. 1025, 246 S.W.2d 771, 778 (banc), appeal dismissed, 344 U.S. 802 (1952)). The standard established by the constitutional provisions is one of reasonableness. *Elam*, 784 S.W.2d at 334. Judicial review in zoning cases is then limited to the consideration of the reasonableness of existing zoning provisions. *Renick v. City of Maryland Heights*, 767 S.W.2d 339, 342 (Mo.App.1989).

Zoning may be unreasonable on its face or unreasonable in its application to a particular tract of land. *White v. City of Brentwood*, 799 S.W.2d 890, 892 (Mo.App. 1990); *Elam*, 784 S.W.2d at 334. In determining whether zoning is reasonably related to achieving some legitimate purpose as applied to a particular tract of land, Missouri courts consider whether application of the zoning is substantially related to the alleged purpose of the zoning, as well as the private detriment caused by the application. *Elam*, 784 S.W.2d at 334; *see also Huttig v. City of Richmond Heights*, 372 S.W.2d 833, 839 (Mo. 1963). Thus, even when zoning does substantially relate to the public welfare, a reviewing court in performing this "balancing test" may find the zoning to be unconstitutionally unreasonable if its detriment to private interests outweighs the public benefit. *Elam*, 784 S.W.2d at 334–35. Courts consider the adaptability of the subject property to its zoned use and the effect of zoning on property value in assessing private detriment. *Id.* at 335. The character of the neighborhood, the zoning and uses of nearby property, and the detrimental effect that a change in zoning would have on other property in the area are relevant to the determination of public benefit. *White*, 799 S.W.2d at 894; *Elam*, 784 S.W.2d at 336.

Since zoning, rezoning, and refusals to rezone are legislative acts, this court reviews de novo any challenges to their validity. *J.R. Green Properties v. Bridgeton*, 825 S.W.2d 684, 686 (Mo.App.1992). Zoning ordinances are presumed to be valid, and this presumption cannot be lightly cast aside.

*Home Bldg. Co. v. City of Kansas City*, 666 S.W.2d 816, 819 (Mo.App.1984). The challenger of the application of a zoning ordinance bears the burden of proving an ordinance is unreasonable as applied to his or her property by clear and convincing evidence. *Id. See also Elam*, 784 S.W.2d at 335. The challenger's burden is made even greater by the principle that any uncertainty about the reasonableness of a zoning regulation must be resolved in the government's favor. *Elam*, 784 S.W.2d at 335. If the issue of reasonableness is at least fairly debatable, (i.e., there is substantial evidence of reasonableness and unreasonableness) the court on review may not substitute its opinion for that of the zoning authority which enacted the challenged provision. *Id.* at 335, 335 n. 4.

The analytical framework for reviewing zoning provisions is thus a two-step process. First, the court determines whether the evidence of the property owner has rebutted the presumption that continuation of the present zoning is reasonable. *Id.* at 335. Second, the court determines if the government's evidence establishes that the reasonableness of continuing the present zoning is a fairly debatable issue. *Id.*

## Barber's Evidence

### Private Detriment

Barber argues that the zoning provisions governing the twelve-acre parcel are unreasonable as applied to the parcel. At trial, Barber attempted to rebut the presumption that the existing zoning is reasonable by showing its private detriment exceeded any public benefit. Barber presented evidence, which the trial court incorporated into its findings of fact, that the value of the twelve-acre parcel as currently zoned residential with the special use permit No. S–499 was $5,000 an acre or $60,000, while its value if rezoned to "light industrial" would be $48,300 an acre or $580,000. While Barber's evidence does show that the twelve-acre parcel is worth less as currently zoned than it would be under the proposed rezoning, this is a detriment to which this court does not afford significant weight. *White*, 799 S.W.2d at 893. If land value were the determining factor,

"residential areas would be difficult to maintain for commercial land has a higher market value than residential." *J.R. Green*, 825 S.W.2d at 686.

The bulk of the remainder of Barber's evidence presented during its case in chief focused on the industrial nature of the land immediately surrounding the twelve-acre parcel, the unsuitability of the twelve-acre parcel for *residential* or *agricultural* use, the advantages the proposed rezoning would provide to Jackson County Readymix, the compatibility of the proposed readymix plant with the existing use of the surrounding land, and the negligible impact the plant would have on both the residential development and the traffic conditions in the area. During the presentation of its rebuttal evidence, Barber attempted to counter the evidence of Lotawana, Inc., and Jackson County that the current quarrying operations of Barber have detrimentally affected the surrounding residential developments. Barber also attempted to prove through the testimony of several members of the Jackson County Legislature that the Legislature's refusal to approve Barber's application for rezoning was based not on a consideration of the facts but on the large number of people present at the time the vote took place who opposed the application. The only rebuttal evidence Barber presented concerning the reasonableness of the current zoning was the testimony of the man who served as the public works director for Jackson County at the time Permit No. S–499 was amended. The former director testified that once the amendment allowing twenty years of surface preparation was granted, the planning division of his department opined that the single family housing zoning would be "virtually useless or obsolete."

A review of the evidence presented by Barber reveals that Barber has based its contention that the existing zoning of the twelve-acre parcel is unreasonable on the precept that the "existing zoning," for purposes of the "reasonableness" analysis, is District A, single family residential. Identifying the existing zoning of the land as residential, however, without considering the special use permit covering the land, mischaracterizes the actual use of the land allowed Barber.

Pursuant to Jackson County Code Sections 24200 (specifying the procedure for obtaining special use permits) and 24202.15 (providing that quarrying and mining fall within the special use classes), Jackson County granted Barber permission to operate a quarry on its land through the issuance of a special use permit. Although a special use permit is not the equivalent of a rezoning, Donald G. Hagman & Julian Conrad Juergensmeyer, *Urban Planning and Land Development Control Law* § 6.11 (2d ed. 1986), or even an amendment of a zoning ordinance, *City of Lake Lotawana v. Lehr*, 529 S.W.2d 445, 449 (Mo. App.1975), a special use permit does affect the zoning of the particular area it covers by allowing the owner a use of the area that the owner otherwise would not have. The purpose of the special use permit is to provide a locality the means to control certain land uses considered desirable but which, by their nature, constitute a potential hazard to the public health and safety. 2 Mo. Real Estate Practice, § 14.19 (MoBar 3d ed. 1986). By restricting certain uses to a special permit, the legislative body of the locality retains the power to make adjustments to the use as circumstances dictate. *Id.* Special permits are especially valuable for land unintensively used for which patterns of development have not become clear. Hagman & Juergensmeyer, *supra*, § 6.11. The special permit procedure provides localities with "the flexibility and broad latitude to meet changing problems of land use control, by allowing zoning authorities to permit these uses when beneficial to the general community while, at the same time, imposing conditions that are tailored to meet the threat to nearby property owners." 6 Patrick J. Rohan, *Zoning and Land Use Controls*, § 44.01[4] (Lori A. Hauser & Nancy H. Greening, eds., 1992).

Special use permits affect the use of land and are relevant to the reasonableness of the zoning of land they encompass. Because reviewing courts must look at the particular facts and circumstances of each case in determining the reasonableness of existing zoning, *Vatterott v. City of Florissant*, 462 S.W.2d 711, 713 (Mo.1971), this court, in con-

sidering the reasonableness of the existing zoning of the twelve-acre parcel, must consider the special use permit affecting that zoning.

The evidence presented by all parties demonstrated that Barber was successfully operating its quarry on the land covered by the special permit, including the twelve acres, which Barber was using at the time of trial to store crushed rock and by-products. All of the evidence indicated that Barber would be able to profitably pursue its future plans for the quarry, including its plan to surface mine the twelve-acre parcel. The twelve-acre parcel was thus quite adaptable to its zoned use as modified by the special permit. The only use of the land Barber sought that was denied under the existing zoning was the construction and operation of a readymix plant.

*Public Benefit*

In its effort to prove that the public benefit of retaining the existing zoning was small, Barber presented evidence of the increasingly industrial nature of the land immediately surrounding the twelve-acre parcel. Barber noted that the twelve-acre parcel lies in the middle of a rock quarry and is adjacent to an eight-acre parcel previously rezoned for heavy industry which contains an operating asphalt plant.

The zoning and use of the property surrounding the subject property is essential in the consideration of reasonableness. *West Lake Quarry v. City of Bridgeton,* 761 S.W.2d 749, 751 (Mo.App.1988). Although the previous rezoning of eight acres of land touching the northeast corner of the twelve-acre parcel is relevant to this court's determination of the reasonableness of the zoning of the subject parcel, the fact that adjoining property is less restricted than the property in question does not establish unreasonableness. *Flora Realty,* 246 S.W.2d at 779. Furthermore, with the exception of the eight acres containing the asphalt plant, the majority of the 2400 acres of land immediately surrounding the quarry and owned by Bar-

ber at the northwest corner of Missouri Highway 7 and U.S. Highway 50 is zoned either District A, First Dwelling House District, or District D, Agricultural District. The twelve-acre parcel itself is part of 1,375 acres of land zoned residential.

The area immediately surrounding the twelve acres has become more industrial only because of the special use permit covering the quarry area. The special use permit, however, limits the time period the mining activities will be allowed. After the permit expires, the "industrial" uses will no longer be authorized under the District A zoning. Moreover, as the trial court found, the primary development in the area outside the perimeter of the quarry has been residential.[1] It is reasonable for a zoning authority to prohibit industrial uses that would accessorize a mining operation if those uses would be incompatible with surrounding property uses. *See Goldblatt v. Town of Hempstead, New York,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (where a town ordinance prohibiting further excavation at a sand and gravel pit, around which the town had expanded since the start of the mining operations, was upheld as a valid police regulation).

Barber presented evidence that the readymix plant would have little effect on the residential property in the area and that truck traffic on Highway 7 would actually be reduced by the addition of the plant. Lotawana, Inc., and Jackson County, however, presented evidence that the current operations of the quarry have had a negative impact on the area in terms of increased dust and traffic as well as blasting associated with the quarrying. Witnesses testifying on behalf of the homeowners' association and the county expressed concern that any increased industrial use of the twelve-acre parcel would exacerbate the problems they perceived already existed in the area. The trial court specifically found that the construction of the proposed readymix plant on the twelve-acre parcel would increase the number of trucks

---

1. Barber argues that "[a]ny increase in the residential use of property over a mile away" is "insignificant and irrelevant when the property immediately adjacent to and surrounding the 12-acre Parcel has become increasingly industrial."

However, Barber cites no case, nor could this court find a case, limiting the consideration of surrounding land use to land *immediately adjacent* to the property proposed for rezoning.

entering and leaving the quarry site by way of Highway 7.[2]

 Barber correctly notes that where a rezoning decision is based *primarily* on a desire to benefit or to refrain from possible injury to a neighboring property owner, that decision is not made for the benefit of the public as a whole. *Huttig*, 372 S.W.2d at 843. Neighboring land owners who have relied on the existing zoning classifications of a parcel proposed for rezoning do, though, have an interest in the perpetuation of such scheme unless a change is compelled by the public good. *Burns v. City of Des Peres*, 534 F.2d 103, 110 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) (citing *Allen v. Coffel*, 488 S.W.2d 671, 678–79 (Mo.App.1972)). Both the Jackson County legislature and the trial court could validly consider the objections presented by neighboring land owners in ruling on Barber's request for rezoning. *Id.*

Barber bore the burden of proving the existing zoning provisions governing its property were unreasonable as applied to the property. *Elam*, 784 S.W.2d at 335. While the evidence adduced at trial revealed that the value of the twelve-acre parcel would be greater if the land were rezoned, the evidence also demonstrated that Barber was enjoying a profitable use of the land as currently zoned and would continue to do so in the future. Barber has shown little private detriment from maintaining the current zoning classification and certainly no detriment which is "substantially greater than that which we accept as a natural consequence of zoning." *White*, 799 S.W.2d at 894. Barber's evidence that the public benefit from retaining the existing zoning is too small to justify its detriment is not convincing. Barber has failed to overcome the presumption that the existing zoning of its property is reasonable. Because the presumption of reasonableness was not rebutted, the burden never shifted to Jackson County to demonstrate that the reasonableness of continuing the present zoning was a fairly debatable

issue. *See Renick*, 767 S.W.2d at 343. Point one is denied.

## II.

Because this court has concluded in point one of this appeal that the judgment of the trial court in refusing to find the existing zoning of the twelve-acre parcel unreasonable was correct, this court necessarily finds that the trial court did not err in failing to order Jackson County to approve the proposed rezoning. Point two is denied.

The judgment of the trial court is affirmed.

All concur.

---

2. The trial court found that Barber intended to continue the sale of rock to Jackson County Readymix's Blue Springs plant as well as to provide rock to the proposed new plant. In addition to the continued shipment of rock from the quarry to the existing plant, the trial court found that the proposed readymix plant would require sand and cement to be trucked into the plant to complete production of the readymix concrete.